UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>              Plaintiff,<br><br>   v.<br><br>JOSEPH FREEDMAN CO., INC.,<br><br>              Defendant. | Case No. 3:22-cv-30047<br><br>**COMPLAINT** |

## INTRODUCTION

1.   Defendant Joseph Freedman Co., Inc. ("Freedman") operates a scrap metal processing facility at 115 Stevens Street, Springfield, Massachusetts (the "Facility"). Freedman discharges polluted industrial stormwater from the Facility through the City of Springfield's municipal separate storm sewer system ("Springfield MS4") into Poor Brook, a tributary of the Chicopee River. The Facility and Poor Brook are located in areas that have been designated by the Commonwealth of Massachusetts ("Commonwealth") as environmental justice communities. The Facility's stormwater contains excessive amounts of lead, zinc, aluminum, iron, copper, chemical oxygen demand ("COD"), and total suspended solids ("TSS"). Excessive heavy metals in runoff pose a long-term threat to aquatic ecosystems, the food chain, and human health. Freedman has not properly controlled and monitored pollution in its stormwater discharges, as is required by the federal Clean Water Act. 33 U.S.C. § 1251 *et seq*. (the "Clean Water Act" or "the Act") and the terms of a stormwater permit ("Stormwater Permit") issued to Freedman by the United States Environmental Protection Agency ("EPA").

2.   Freedman's own sampling results show that for many years it has been discharging stormwater with levels of pollutants, including heavy metals, many times higher than benchmark standards established by EPA.

3.   Freedman's failure to take adequate corrective action to eliminate these excessive pollutant discharges and to otherwise properly control and monitor the quality of its stormwater discharges violates the Clean Water Act and the Stormwater Permit.

4.   Freedman has not consistently monitored stormwater discharges. Freedman's failure to monitor violates the Clean Water Act and the Stormwater Permit.

5.   The Commonwealth brings this civil suit to enforce the requirements of the Act. The Commonwealth seeks injunctive relief, civil penalties, and other relief the Court deems appropriate to redress Freedman's illegal discharges of pollution.

## JURISDICTION AND VENUE

6.   This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

7.   On February 16, 2022, the Commonwealth provided notice of Freedman's violations of the Clean Water Act, and of its intention to file suit against Freedman (the "Notice Letter"), to the Administrator of EPA; the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"); and to Joseph Freedman Co., Inc. as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

8.   More than sixty days have passed since notice was served.

9.   This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this Complaint.

10. The Commonwealth has an interest in protecting for its residents the integrity of Massachusetts waters, and the related health, safety, economic, recreational, aesthetic, and environmental benefits those waters provide. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Freedman's failure to comply with the Clean Water Act, as alleged in this Complaint. The requested relief will redress the harms to the Commonwealth caused by Freedman's activities. Freedman's continuing acts and omissions, as alleged in this Complaint, will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

11. Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

12. Plaintiff is the Commonwealth, appearing by and through the Attorney General.

13. The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the requested relief under G.L. c. 12, §§ 3 and 11D.

14. Defendant Joseph Freedman Co., Inc. is a domestic corporation with its principal address listed as 115 Stevens Street, Springfield, MA 01104.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

15. The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including the requirement that the discharge be permitted by EPA under the National Pollutant

3

Discharge Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

16. Stormwater is the leading cause of water quality impairment in Massachusetts. During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, organic matter, nutrients, metals and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people.

17. To minimize polluted stormwater discharges from industrial facilities, EPA has issued a general industrial stormwater permit ("Stormwater Permit") under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, 2015, and 2021. *See* 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008); 86 Fed. Reg. 10269 (Feb. 19, 2021).[1]

18. Companies that acquire, stockpile, and process scrap metals and that discharge industrial stormwater to waters of the United States directly or through separate storm sewer systems are subject to the requirements of this Stormwater Permit. Stormwater Permit, Appendix D-4 (Sector N).

19. The Stormwater Permit requires these facilities to, among other things:

    a.    select, design, install, and implement pollutant control measures that minimize pollutants in stormwater discharges in accordance with the requirements of Section 2 of the Stormwater Permit and any additional

---

[1] The February 2021 revision of the Stormwater Permit ("2021 Stormwater Permit") is substantially similar to the 2015 version ("2015 Stormwater Permit"). Where there is a difference in citations due to numbering, this Complaint provides citations to each of the revisions. Where there is no difference in Section numbering, this Complaint refers to the two versions jointly as "Stormwater Permit."

pollutant control requirements applicable to scrap recycling facilities, Stormwater Permit, Section 8.N.3;

b.    locate materials, equipment, and activities to contain potential spills, Stormwater Permit, Section 2.1.2.4;

c.    minimize contact of stormwater runoff with Industrial Materials, scrap processing equipment, and scrap processing areas, Stormwater Permit, Section 8.N.3.1.2;

d.    keep clean all exposed areas that are potential sources of pollutants by storing materials in appropriate containers, properly controlling runoff associated with dumpsters, and keeping exposed areas free of waste, garbage and floatable debris, Stormwater Permit, Section 2.1.2;

e.    minimize generation of dust and off-site tracking of Industrial Materials in order to minimize pollutant discharges, Stormwater Permit, Section 2.1.2.10;

f.    collect and analyze stormwater samples for compliance with EPA benchmarks that apply to scrap metal facilities, including for lead, zinc, aluminum, iron,[2] copper, chemical oxygen demand ("COD"), and total suspended solids ("TSS"), Stormwater Permit, Sections 6 and 8.N.7;

g.    conduct routine facility inspections at least quarterly and quarterly visual assessments to, among other things, sample and assess the quality of the facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to

---

[2] The 2021 Stormwater Permit does not include a benchmark limit for iron for scrap recyclers.

minimize pollutant discharge, and to ensure timely corrective actions are taken when they are not, Stormwater Permit, Sections 3.1. and 3.2 (pgs. 22-26);

h.      report all benchmark monitoring data to EPA within mandatory deadlines, Stormwater Permit, Section 7.4 (pgs. 48-49);

i.      conduct and document corrective actions and additional implementation measures within mandatory timelines to expeditiously eliminate excessive stormwater pollution whenever required by the permit, 2015 Stormwater Permit, Section 4.0; 2021 Stormwater Permit, Section 5.0; and

j.      timely prepare and submit to EPA annual reports that include findings from the Facility inspections and visual assessments and the documentation of corrective actions, 2015 Stormwater Permit, Section 7.5; 2021 Stormwater Permit, Section 7.4.

*Citizen Suit Provision of the Federal Clean Water Act*

20. Section 505(a)(1) of the Act authorizes citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5).

21. The Commonwealth is authorized to bring suit under Section 505 of the Act, because it is a "person" having an interest which is or may be adversely affected. *See* 33 U.S.C. § 1365(g).

22. Under Section 505 of the Act, this Court has authority to enjoin Freedman's violations of the Act's prohibition on unauthorized discharges of pollutants and to require the

company to comply with its Stormwater Permit. The Court also has authority to impose penalties of up to $59,973 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. § 19.4; 87 Fed. Reg. 1678 (Jan. 12, 2022).

## STATEMENT OF FACTS

### Description of the Freedman Facility

23. Freedman, founded in 1891, is the oldest and largest privately owned scrap metal processor in New England and operates across two facilities on over twenty (20) acres in Springfield. In addition to the Facility on Stevens Street, the company runs a scrap metal chopping operation located at 40 Albany Street, Springfield.

24. The Facility is a scrap iron and metal processing facility.

25. The Facility is located in the neighborhood of East Springfield across the street from residential properties.

26. One hundred percent of census blocks in the neighborhood of East Springfield have been designated by the Commonwealth locations with environmental justice concerns because the residents of that community have the potential to be disproportionately impacted by environmental harms and risks.

### Description of Activities at the Freedman Facility

27. Freedman receives, stores, and processes scrap metal materials on approximately six (6) acres of impervious surface at the Facility.

28. Freedman acquires materials composed of ferrous and non-ferrous scrap metal, including appliances, and then processes these materials into saleable products. During its processes, Freedman stockpiles unprocessed metal, final products, and waste materials

("Industrial Materials") at the Facility and moves these materials around the Facility with vehicles and heavy equipment ("Equipment").

29. Freedman stores its Industrial Materials uncovered outside. Freedman moves Industrial Material around the Facility, placing it in large piles and in uncovered containers and dropping it onto the ground surface. Industrial Material that Freedman places or drops on the ground mixes with other sediments on the ground.

## Defendant's Discharge of Pollutants from the Facility

*Polluted Industrial Stormwater Discharges to Poor Brook via the Springfield MS4*

30. During every rain or snowmelt event, runoff flows over Equipment and the ground surface at the Facility.

31. Pollutants from activities at the Facility are picked up in stormwater and discharge into the Springfield MS4 via catch basins.

32. Stormwater from the Facility flows via the Springfield MS4 into Poor Brook, a tributary of the Chicopee River.

33. Before its confluence with the Chicopee River, Poor Brook flows through the Delta Hills Conservation Area. This 27-acre natural area is the largest open public space in the neighborhood of East Springfield.

34. The tributary creeks and wetlands within the Chicopee River watershed are important in protecting aquatic resources by acting as a natural filtering system for water quality, by preventing downstream flooding, and by providing natural habitats to native species.

35. Since at least May 1, 2017, during the rain events listed on Attachment A, Freedman has discharged polluted stormwater off the Facility and into Poor Brook via the Springfield MS4.

*Potential Impacts from Pollutants in Freedman's Stormwater Discharges*

36. Freedman's stormwater discharges contain a myriad of pollutants including lead, zinc, aluminum, iron, copper, COD, and TSS.

37. Lead is commonly used as an additive in the steel making process to improve the machinability of the steel. It may be present in the coatings on scrap metal (paints, hot dips, etc.) or it may be present as pure metal, an alloy, or its oxides. The use of heat in the processing of steel scrap can release substantial amount of lead fume, resulting in the settling of lead dust. Abrasive removal of surface coatings also creates lead dust. Lead on the surfaces of scrap metal and lead dust from the processing of scrap is picked up in stormwater and can adversely impact water quality. Lead dust also poses a significant threat to human health and safety. Adverse effects of lead in water on aquatic species occur at very low concentrations, and include reduced survival, impaired reproduction, and reduced growth. Even at low levels, lead may cause a range of human health effects, including learning disabilities, kidney problems, and high blood pressure. Children are particularly vulnerable to impacts from lead contamination.

38. Zinc is used in metal alloys such as brass, nickel silver, and aluminum solder, and is used in metal galvanizing, a process of applying a coating to steel or iron to slow the rate of corrosion. Adverse effects of excessive dissolved zinc among aquatic species include altered behavior, blood and serum chemistry, impaired reproduction, and reduced growth.

39. Aluminum is the most widely recycled nonferrous metal. Sources of aluminum in a metal scrap yard may include left-over material from industrial processes (e.g., aluminum left over when can lids are punched out of sheets), or aluminum from building siding or fixtures. Elevated levels of aluminum can affect some species' ability to regulate ions, like salts, and inhibit respiratory functions, like breathing. Aluminum can accumulate on the surface of a fish's gill, leading to respiratory dysfunction, and possibly death.

40. Ferrous scrap is metal that contains iron. Iron and steel (which contains iron) can be processed and re-melted repeatedly to form new objects. Ferrous scrap comes from sources such as mill scrap (from primary processing), used construction beams, plates, pipes, tubes, wiring, and shot, automotive scraps, railroad scrap and railcar scrap, and other miscellaneous scrap metal. Ferrous metals are magnetic and are often collected in scrap yards by a large electromagnet attached to a crane, sweeping across piles of scrap to grab magnetic objects. Excessive concentrations of iron in the aquatic environment can cause oxidation of gill tissue, gill damage, anemia, and secondary bacterial and fungal infections in fish. Iron in the form of solid particulate can settle on the bottom of water bodies and destroy bottom-dwelling invertebrates, plants, or incubating fish eggs. Iron can also cause aesthetically objectionable conditions in water bodies by making the water appear rust colored.

41. Copper is used in a variety of applications such as pipes, electrical components, and electric wires. The storage and processing of these components can lead to contamination of stormwater runoff at scrap yard facilities. The melding or grinding of copper metal may increase the presence of copper dust. Copper in at high concentrations has a negative impact on fish and wildlife and may impact predator avoidance behaviors, growth, and migration.

42. COD is a measurement of organic matter in water. Excessive discharges of organic matter pose a risk of harm to water quality and aquatic life. When high levels of organic matter are discharged to a waterbody, the presence of bacteria, fungi, and other decomposer organisms increases. The presence of decomposer organisms and the decomposition process lowers the available oxygen in the water, impairing other aquatic organisms or, in severe cases, asphyxiating them.

43. TSS is an indicator parameter that measures the presence of solids, or sediment, suspended in a water sample. Solids in scrap yard stormwater discharges are likely to include non-dissolved metal particles and contaminated soil. Even uncontaminated sediment destroys habitat, harms aquatic organisms, and can contribute to flooding. Sediment settles to the bottom of a river where it disrupts and smothers bottom feeding organisms. Sediment becomes suspended in water, where it harms and kills fish by clogging their gills, making it harder for them to breathe. Excessive sedimentation harms the entire food chain by destroying habitat and killing the smaller organisms on which larger ones depend. For example, sediment in the water column increases turbidity, reducing light penetration, decreasing the ability of plant communities to photosynthesize, preventing animals from seeing food, and reducing fish populations. In addition, other pollutants, including toxic pollutants such as heavy metals, pesticides, and petroleum by-products, bind to sediment and can significantly impact water quality when carried by stormwater to rivers and other waterbodies.

**Freedman's Inadequate Implementation of EPA's Stormwater Requirements**

44. On or around September 15, 2015 Freedman submitted a Notice of Intent to be covered by the Stormwater Permit.

45. Freedman's NOI designates two outfalls, Outfall 001 and Outfall 002.

*Failure to Minimize Pollutant Discharges*

46. Freedman's monitoring reports show that the presence of pollutants in its stormwater discharges from Outfall 001 routinely exceed by large orders of magnitude EPA benchmark limits for lead, zinc, aluminum, iron, copper, COD, and TSS. *See* Table 1: Benchmark Exceedances Since 2016.

**Table 1: Benchmark Exceedances Since 2016**

| Quarter End Date | Parameter | EPA Benchmark Value | Amount in Sample | Percentage Above Benchmark |
|---|---|---|---|---|
| **6/30/2018** | Lead | .014 mg/l | .089 mg/l | 635.71% |
| | Aluminum | .75 mg/l | 1.7 mg/l | 226.67 % |
| | Iron | 1 mg/l | 3.7 mg/l | 370 % |
| | Copper | 3.8 µg/l | 130 µg/l | 3421.05% |
| | Zinc | .04 mg/l | 0.35 mg/l | 875 % |
| **3/31/2019** | Lead | 0.014 mg/l | 0.87 mg/l | 6214.29 % |
| | Aluminum | .75 mg/l | 24 mg/l | 3200 % |
| | COD | 120 mg/l | 510 mg/l | 425 % |
| | Iron | 1 mg/l | 43 mg/l | 4300 % |
| | TSS | 100 mg/l | 580 mg/l | 580 % |
| | Copper | 3.8 µg/l | 900 µg/l | 23684.21 % |
| | Zinc | .04 mg/l | 2.8mg/l | 7000 % |
| **6/30/2019** | Lead | 0.014 mg/l | 0.064 mg/l | 457.14 % |
| | Aluminum | .75 mg/l | 1.2mg/l | 160 % |
| | COD | 120 mg/l | 160 mg/l | 133.33 % |
| | Iron | 1 mg/l | 1.9 mg/l | 190 % |
| | Copper | 3.8 µg/l | 120 µg/l | 3157.89 % |
| | Zinc | .04 mg/l | .3 mg/l | 750 % |
| **9/30/2019** | Lead | 0.014 mg/l | 0.43 mg/l | 3071.43 % |
| | Aluminum | .75 mg/l | 11 mg/l | 1466.67 % |
| | COD | 120 mg/l | 340 mg/l | 283.33 % |
| | Iron | 1 mg/l | 26 mg/l | 2600 % |
| | TSS | 100 mg/l | 270 mg/l | 270 % |
| | Copper | 3.8 µg/l | 580 µg/l | 15263.15 % |
| | Zinc | .04 mg/l | 2.2 mg/l | 5500 % |
| **12/31/2019** | Lead | 0.014 mg/l | 0.87 mg/l | 6214.29 % |
| | Aluminum | .75 mg/l | 22 mg/l | 2933.33 % |
| | COD | 120 mg/l | 680 mg/l | 566.67 % |
| | Iron | 1 mg/l | 41 mg/l | 4100 % |
| | TSS | 100 mg/l | 560 mg/l | 560 % |
| | Zinc | .04 mg/l | 3.5 mg/l | 8750 % |
| **6/30/2020** | Lead | 0.014 mg/l | 0.98 mg/l | 7000 % |
| | Aluminum | .75 mg/l | 19 mg/l | 2533.33 % |

12

| Quarter End Date | Parameter | EPA Benchmark Value | Amount in Sample | Percentage Above Benchmark |
|---|---|---|---|---|
| | COD | 120 mg/l | 720 mg/l | 600 % |
| | Iron | 1 mg/l | 50 mg/l | 5000 % |
| | TSS | 100 mg/l | 1000 mg/l | 1000 % |
| | Zinc | .04 mg/l | 4.4 mg/l | 11000 % |
| 9/30/2020 | Lead | 0.014 mg/l | 1.5 mg/l | 10714.29 % |
| | Aluminum | .75 mg/l | 34 mg/l | 4533.33 % |
| | COD | 120 mg/l | 210 mg/l | 175 % |
| | Iron | 1 mg/l | 63 mg/l | 6300 % |
| | TSS | 100 mg/l | 560 mg/l | 560 % |
| | Copper | 3.8 µg/l | 1400 µg/l | 36842.11 % |
| | Zinc | .04 mg/l | 5.7 µg/l | 14250 % |
| 12/31/2020 | Lead | 0.014 mg/l | .021 mg/l | 150 % |
| | TSS | 100 mg/l | 140 mg/l | 140 % |
| | Copper | 3.8 µg/l | 39 µg/l | 1026.32 % |
| | Zinc | .04 mg/l | .14 mg/l | 350 % |
| 3/31/2021 | Lead | 0.014 mg/l | .47 mg/l | 3357.14 % |
| | Aluminum | .75 mg/l | 8.6 mg/l | 1146.67 % |
| | COD | 120 mg/l | 420 mg/l | 350 % |
| | Iron | 1 mg/l | 23 mg/l | 2300 % |
| | TSS | 100 mg/l | 340 mg/l | 340 % |
| | Copper | 3.8 µg/l | 470 µg/l | 12368.42 % |
| | Zinc | .04 mg/l | 2.2 mg/l | 5500 % |
| | Lead | 0.014 mg/l | 1.3 mg/l | 9285.71 % |
| 6/30/2021 | Aluminum | .75 mg/l | 17 mg/l | 2266.67 % |
| | Iron | 1 mg/l | 41 mg/l | 4100 % |
| | TSS | 100 mg/l | 3300 mg/l | 3300 % |
| | Copper | 3.8 µg/l | 1200 µg/l | 31578.95 % |
| | Zinc | .04 mg/l | 5.5 mg/l | 13750 % |
| | Lead | .014 mg/l | 1.3 mg/l | 9285.71% |
| 12/31/2021 | Aluminum | 1100 ug/l | 21000 ug/l | 1909.09 % |
| | COD | 120 mg/l | 490 mg/l | 408.33 % |
| | TSS | 100 mg/l | 520 mg/l | 520 % |
| | Copper | 5.19 µg/l | 1200 µg/l | 23121.39 % |
| | Zinc | 107 ug/l | 3500 µg/l | 3271.03 % |
| | Lead | 69 µg/l | 580 µg/l | 840.58 % |

47. Freedman has repeatedly exceeded each and every EPA benchmark limit by a large order of magnitude. As shown in Table 1, Freedman has failed to minimize pollutants in its stormwater discharge. Freedman failed to modify its control measures per the corrective action

requirements of the Stormwater Permit after it became clear that its control measures were not achieving their intended effect of minimizing pollutant discharges.

48. Accordingly, the Permit required corrective action to address exceedances by, at the latest, May 16, 2016.

49. Freedman has failed to locate materials, equipment, and activities to contain potential spills.

50. Freedman has failed to minimize contact of stormwater runoff with Industrial Materials, scrap processing equipment, and scrap processing areas.

51. Freedman has not kept clean all exposed areas that are potential sources of pollutants by storing materials in appropriate containers, properly controlling runoff associated with dumpsters, and keeping exposed areas free of waste, garbage, and floatable debris.

52. Freedman has not minimized generation of dust and off-site tracking of Industrial Materials in order to minimize pollutant discharges.

53. Freedman has failed to appropriately conduct routine and quarterly facility inspections to ensure, among other things, that control measures are functioning correctly and are adequate to minimize pollutant discharges and to ensure that corrective actions are timely performed when necessary.

*Inadequate Monitoring and Reporting*

54. Freedman has failed to consistently perform and submit to EPA benchmark monitoring reports on the quantity of pollutants in stormwater that it discharges through Outfall 001. Specifically, Freedman failed to monitor and report on its compliance with benchmark limits at Outfall 001 during several calendar quarters as described below:

14

**Table 2: Quarters for which Freedman Failed to Submit Benchmark Monitoring Data**

| Quarter End Date | Benchmark Monitoring Date Due |
|---|---|
| 3/31/2017 | 4/30/2017 |
| 6/30/2017 | 7/30/2017 |
| 9/30/2017 | 10/30/2017 |
| 12/31/2017 | 1/30/2018 |
| 3/31/2018 | 4/30/2018 |
| 9/30/2020 | 10/30/2020 |

55. Freedman has not collected or analyzed stormwater samples from Outfall 002 at any time during the last five years.

*Failure to Submit an Annual Report to EPA*

56. Freedman failed to submit to EPA annual reports for the years of 2019 and 2020.

**FIRST CAUSE OF ACTION**

**Noncompliance with the Federal Stormwater Permit:**
**Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

57. The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

58. Joseph Freedman Co., Inc. is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

59. Poor Brook is a "navigable water" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

60. Freedman has violated the Stormwater Permit since at least May 1, 2017, by failing to:

    a.   select, design, install, and implement pollutant control measures that minimize pollutants in stormwater discharges (violations of sections 2.1 and 8.N.3);

b.  locate materials, equipment, and activities to contain potential spills (violations of section 2.1.2.4);

c.  minimize contact of stormwater runoff with Industrial Materials, scrap processing equipment, and scrap processing areas (violations of section 8.N.3.1.2);

d.  keep clean all exposed areas that are potential sources of pollutants by storing materials in appropriate containers, properly controlling runoff associated with dumpsters, and keeping exposed areas free of waste, garbage and floatable debris, Stormwater Permit (violations of section 2.1.2);

e.  minimize generation of dust and off-site tracking of Industrial Materials in order to minimize pollutant discharges, Stormwater Permit (violations of section 2.1.2.10);

f.  conduct and document corrective action within mandatory timelines to expeditiously eliminate excessive stormwater pollution whenever the average of four quarterly sampling results exceeds an applicable benchmark (violations of sections 2.1 and 4.2); and

g.  conduct routine facility inspections at least quarterly and quarterly visual assessments to, among other things, sample and assess the quality of the facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant discharge, and timely perform corrective actions when they are not (violations of sections 3.1. and 3.2).

61. Freedman has violated the Stormwater Permit since at least April 30, 2017, by failing to:

    a.   collect and analyze stormwater samples for compliance with EPA benchmarks that apply to scrap metal facilities, including for lead, zinc, aluminum, iron, copper, chemical oxygen demand ("COD"), and total suspended solids ("TSS") (violations of sections 6 and 8.N.6); and

    b.   report all benchmark monitoring data to EPA within mandatory deadlines (violations of section 7.4).

62. Freedman violated the Stormwater Permit since at least January 30, 2020 by failing to submit annual reports for the years 2019 and 2020 with findings from the facility inspections and visual assessments and the documentation of corrective actions (section 7.5).

63. Each of Freedman's violations of each of the requirements of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Section 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

64. These violations establish an ongoing pattern of failure to comply with the Stormwater Permit's requirements.

## RELIEF REQUESTED

WHEREFORE, the Commonwealth respectfully requests that this Court grant the following relief:

1. Require Freedman to comply with EPA's federal Stormwater Permit;

2. Order Freedman to pay civil penalties of up to $59,973 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. § 19.4; 87 Fed. Reg. 1678 (Jan. 12, 2022);

3.   Order Freedman to take appropriate actions to restore the quality of protected areas impaired by its activities;

4.   Award the Commonwealth's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

5.   Award any such other and further relief as this Court may deem appropriate.


Dated: April 19, 2022


Respectfully submitted,


COMMONWEALTH OF MASSACHUSETTS

By its attorneys,

MAURA HEALEY
ATTORNEY GENERAL

Emily K. Mitchell (Bar No. 703726)
Nora J. Chorover (Bar No. 547352)
Assistant Attorneys General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 963-2207
Emily.Mitchell@mass.gov

EXHIBIT A

DAYS BETWEEN MAY 1, 2017 AND APRIL 9, 2022
ON WHICH STORMWATER FROM FACILITY
DISCHARGED INTO WATERS OF THE UNITED STATES

| Year | Month | Date |
| --- | --- | --- |
| 2017 | May | 5, 6, 13, 25, 26, 31 |
| 2017 | June | 5, 6, 19 |
| 2017 | July | 7, 18 24 |
| 2017 | August | 5, 22 |
| 2017 | September | 3, 6 |
| 2017 | October | 8, 9, 24, 25, 26, 29 |
| 2017 | November | |
| 2017 | December | 5, 12, 23 |
| 2018 | January | 12, 13, 23 |
| 2018 | February | 4, 7, 10, 11, 23, 25 |
| 2018 | March | 2 |
| 2018 | April | 3, 25 |
| 2018 | May | 15, 19, 27 |
| 2018 | June | 4, 18, 24, 27, 28 |
| 2018 | July | 17, 22, 23, 25, 26 |
| 2018 | August | 1, 3, 17, 18, 22 |
| 2018 | September | 10,12,18, 25, 26, 28 |
| 2018 | October | 2, 11, 27, 29 |
| 2018 | November | 2, 3, 5, 6, 9, 13, 15, 16, 19, 26, 27 |
| 2018 | December | 2, 16, 21, 28, 31 |
| 2019 | January | 5, 20, 24 |
| 2019 | February | 6, 12, 24 |
| 2019 | March | 10, 22 |
| 2019 | April | 8, 13, 15, 20, 22, 26 |
| 2019 | May | 12, 13, 23, 28 |
| 2019 | June | 10, 11, 16, 25 |
| 2019 | July | 11, 22, 23, 31 |
| 2019 | August | 7, 21, 28 |
| 2019 | September | 2, 12 |
| 2019 | October | 16, 17, 22, 27, 31 |
| 2019 | November | 19, 24 |
| 2019 | December | 1, 9, 13, 14, 29, 30 |

| 2020 | January | 18 |
|------|---------|-----|
| 2020 | February | 6, 7, 13, 27 |
| 2020 | March | 13, 19, 23, 28, 29 |
| 2020 | April | 9, 13, 18, 21, 30 |
| 2020 | May | 1, 15 |
| 2020 | June | 11, 27, 29 |
| 2020 | July | 3, 22 |
| 2020 | August | 2, 9, 17, 27, 29 |
| 2020 | September | 2, 3, 29, 30 |
| 2020 | October | 13, 16, 17, 28, 29, 30 |
| 2020 | November | 1, 15, 23, 26, 30 |
| 2020 | December | 5, 25 |
| 2021 | January | 2, 16 |
| 2021 | February | 16 |
| 2021 | March | 18, 28 |
| 2021 | April | 15, 21, 29 |
| 2021 | May | 3, 4, 5, 10, 26, 28, 29, 30 |
| 2021 | June | 8, 14 |
| 2021 | July | 1, 2, 6, 8, 9, 11, 12, 14, 16, 17, 18, 27, 29 |
| 2021 | August | 12, 19, 22, 23 |
| 2021 | September | 1, 2, 24 |
| 2021 | October | 3, 4, 16, 25, 26, 30 |
| 2021 | November | 12, 13 |
| 2021 | December | 11, 18 |
| 2022 | January | 17 |
| 2022 | February | 3, 4, 22, 25 |
| 2022 | March | 7, 24 |
| 2022 | April | 7, 8 |

Exhibit A Page 2